ORIGINAL

FILED
MAY 30 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

NATIONAL AIR CARGO, INC.,

Plaintiff,

v.

THE UNITED STATES

Defendant.

No. 08-400 C

## COMPLAINT

Plaintiff National Air Cargo, Inc. ("NAC"), by its undersigned counsel, respectfully submits its Complaint against Defendant United States ("Government") as a result of conduct by the United States and alleges and states as follows in support of its claims.

## NATURE OF THE ACTION

1. NAC is an air freight forwarder that contracts with the Defendant to ship, among other things, military freight within the contiguous United States. Under the terms of the contracts formed between NAC and the United States, NAC is entitled to ship the freight in a mode-neutral manner (i.e., wholly by land, wholly by air, or by some combination of both). However, in March of 2005, Air Mobility Command ("AMC"), sent a letter to NAC threatening to withhold all future domestic military freight shipments unless NAC began using an airplane in at least one leg of every domestic military freight shipment. On information and belief, no other air freight forwarder was or has been given this order. The Government's conduct amounted to a breach of its contracts with NAC as well as discriminatory treatment which has impaired NAC's ability to obtain future shipment contracts. NAC has filed this Complaint seeking declaratory judgment as to the meaning of the contract, and to recover the damages incurred as a result of the Government's breaches of contracts, regulatory violations, and arbitrary and capricious treatment of NAC.

**PARTIES**

2. Plaintiff NAC is a corporation, incorporated under the laws of New York, with its principal office located at 350 Windward Drive, Orchard Park, New York 14127.

3. The United States, the Defendant, procures air freight forwarding services for the domestic movement of military freight, and is responsible for the Government's breaches of contract and the Constitutional and regulatory violations that have occurred as part of that procurement and contracting process.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction and venue is proper pursuant to 28 U.S.C. § 1491(a) and (b).

**FACTS**

5. NAC is an air freight forwarder that ships freight for the United States military within the contiguous United States and internationally. As an air freight forwarder, NAC does not own or operate its own aircraft. Rather, it contracts with land, sea, and air carriers to handle the pickup, carriage, and delivery of freight much as a travel agent books transportation for human travel.

6. Under Department of Defense ("DoD") regulations, all freight forwarders that offer their services to the DoD are required to be registered with and approved by the Surface Deployment and Distribution Command ("SDDC," formerly the Military Traffic Management Command ("MTMC")), an agency within the United States Army.

7. On March 17, 1997, NAC and SDDC entered into an agreement governing NAC's transportation of freight on behalf of the DoD (the "SDDC Agreement"), attached as Exhibit A.

8. The SDDC Agreement states clearly and unequivocally that NAC will operate as an air freight forwarder and therefore is permitted to ship government freight by air, truck, or both. The SDDC Agreement defines an air freight forwarder as:

> a person or company who acts as a common carrier. That is, a carrier who holds itself out to the general public to provide transportation of property for compensation, assembles and consolidates less-than-truckload freight, as defined in the Instruction for Preparation of Department of Defense Standard Tender of Freight Services, MT Form 364-4 (and revisions thereto), Part II, and ***uses for the whole or any part of the line-haul transportation the services of regulated motor or air carriers***, break bulk and delivers the less-than-truckload freight holding out in its own name and under its own responsibility a through transportation service from point of receipt to destination.

SDDC Agreement (Exhibit A) at ¶ 1 (emphasis added).

9. The SDDC Agreement goes so far as to require NAC to certify that it will operate as a "forwarder" as defined in the Agreement. It is illegal for an air freight forwarder to hold itself out as an air carrier, and an air freight forwarder that did so would face significant regulatory sanctions.

10. As stated in the SDDC Agreement, the terms of the SDDC Agreement apply to every freight shipment transported by NAC. Exhibit A.

11. The SDDC Agreement has never been revoked or terminated by the Government or NAC.

12. Once registered and approved by SDDC, air freight forwarders, including NAC, bid for work by filing tenders in a computer system, known as the Global Freight Management System ("GFM"), set up by the DoD to solicit and collect domestic tender offers, which then become available to DoD Transportation Officers who need to ship military freight within the continental United States. A tender is a continuing offer by an air freight forwarder to move

freight from point A to point B for a specified price (usually based on weight, volume, and desired delivery time of the freight).

13. The rates specified in an air freight forwarder's tenders are determined primarily by the type of service requested, e.g., priority service, overnight service, second day service, etc. This is referred to in the industry as "time-definite" delivery. An air freight forwarder's tender rates are not determined by the manner in which the freight is moved, e.g., by truck or airplane. Consequently, the rates NAC specifies in its tender reflect "blended rates"—a pricing estimate based on the forwarder's discretion to use the most efficient and cost-effective mode of transportation available to ensure the freight is delivered on time. This discretion to use the most cost-effective and efficient of transportation available is referred to in the industry as being "mode neutral."

14. A DoD Transportation Officer, usually at a military base or depot, who needs to ship freight within the continental United States considers how quickly the freight needs to be delivered, selects an appropriate tender from the GFM system, and issues a bill of lading ("BL") to the selected air freight forwarder.

15. A BL is a generic term for shipment documentation that is used interchangeably with Government Bill of Lading ("GBL") or Commercial Bill of Lading ("CBL"). Since 1995, when the Government issues a BL it uses the CBL of the air freight forwarder that submitted the tender offer that the Government wishes to accept.

16. The combination of the tender and the CBL form an express contract to provide transportation services between the air freight forwarder and the Government. The resulting contract is governed by the terms of the tender (and any incorporated references therein), representing the air freight forwarder's offer, and the CBL, representing the DoD shipper's acceptance.

17. On January 15, 1999, Air Mobility Command ("AMC"), an Air Force command then responsible for certain aspects of procuring domestic military freight services, issued AMC Freight Traffic Rules Publication No. 5 ("AFTRP No. 5"). The regulation became effective on January 20, 1999.

18. AFTRP No. 5 governs the transportation of DoD freight traffic within the contiguous United States by air carriers, air freight forwarders, and air taxis, each of which is treated differently as distinct entities within the regulation. For example, the regulation states, "[a]s a prerequisite to submitting tenders to the DoD, ***air carriers*** must be approved by Air Mobility Command's Survey and Analysis Office, HQ AMC/DOB, and ***air freight forwarders*** must be qualified under the MTMC [now SDDC] Qualification Program." (emphasis added).

19. AFTRP No. 5 further provides that "[w]hen rules, regulations, charges, or other provisions provided by [SDDC] in specific publications differ from or conflict with the provisions of this publication, the provisions contained in the specific publications or solicitations will apply, but only to the specific movements named therein."

20. AFTRP No. 5 states that "[s]hipments tendered to ***carriers for air service*** must move, all or in part, via air transportation unless extreme conditions (e.g., severe weather, strikes, etc.) warrant diversion to motor service." (the "Air Leg Requirement") (emphasis added).

21. NAC attended an industry meeting with AMC in November of 1998. The purpose of the meeting was to discuss the new provisions in the soon-to-be-published AFTRP No. 5. In response to a question regarding the provision discussed in Paragraph 20, the AMC representative stated that "this language is intended for use by those arranging shipments (TO [Transportation Officer] or govt rep), not air carrier/freight forwarders."

22. NAC, and the rest of the air freight forwarding industry, do not interpret AFTRP

No. 5 to apply the Air Leg Requirement to shipments moved by air freight forwarders like NAC. This interpretation is based upon:

a. DoD Regulations.

i. "Air carriers" are defined in DoD regulations as "[c]ommercial air carriers and commercial air operators ***that operate commercial fixed- and rotary-wing aircraft***." NAC does not own or operate any aircraft as part of its domestic air freight forwarding business.

ii. The Defense Transportation Regulations ("DTR") define an air freight forwarder as "[a] firm ***other than*** a railroad, motor, water, or ***air carrier*** that represents itself as a common carrier and undertakes to assemble and consolidate shipments or provide for assembling and consolidating and performing or providing for the performance of breakbulk and distributing."

b. The Plain Language of the AFTRP No. 5. As noted above, the plain language of the AFTRP No. 5 provision that states that a shipment must move all or in part by air applies by its own terms only to "carriers for air service" and not to air freight forwarders.

c. The Tender Identifying NAC as a Mode L Air Freight Forwarder. All of NAC's tender offers on file in GFM designate NAC's tender offers as being made under Mode L. The Defense Transportation Regulations specify that air freight forwarders file tenders under Mode L and air carriers file tenders under Mode K.

d. The Express Terms of the Commercial Bill of Lading. NAC's CBL, which together with the tender offer becomes the express contract between NAC and the Government, since 2004 has contained the following provisions:

In tendering this Shipment, Shipper agrees to all terms of this non-negotiable airbill. It is

> agreed among the parties involved that the conditions of contract of carriage for this Shipment are governed by Forwarder's tariffs [tenders], available for inspection at Forwarder's offices, and which are hereby incorporated into this contract, and a copy of which will be supplied upon request. Except to the extent of any written contract between Shipper and Forwarder, this shipping document supersedes and negates any claimed, alleged, or asserted oral or written contract, promise, representation, or understanding between the parties with respect to this Shipment. In the event that Shipment is tendered to Forwarder on a straight bill of lading or any other shipping document, Forwarder's rules and regulations will supersede any rules and regulations contained on the shipping document on which the freight was tendered. . . .
>
> **Routing.** Forwarder shall have the right to (a) substitute alternate carriers or other means of transportation (including all ground transportation) and (b) select the routing or deviate from that shown on the face hereof. In the event any Shipment is transported via ground transportation, Forwarder and Shipper expressly agree to waive the applicability of 49 U.S.C. § 14706, and to accept the cargo liability standards and limitations set forth in these terms and conditions.

e. The SDDC Agreement. The SDDC Agreement, as discussed above, defines an air freight forwarder as a person or company that "uses for the whole or any part of the line-haul transportation the services of regulated motor or air carriers."

f. The IATA Regulations Incorporated by AFTRP No. 5. AFTRP No. 5 incorporates the rules of the International Air Transport Association ("IATA"), which explicitly state that shipments can be transported "***wholly or partly by any means of surface transportation***."

g. DoD Regulation and Policy.

i. DoD's stated policy established by the Under Secretary of Defense for Acquisition and Technology "requires the use of best-commercial practices and best-value evaluation procedures when acquiring transportation services." This policy is codified in the DTR, Part II, Chapter 201 § L (5), which states that "DOD activities will use best-commercial practices and streamline 'best-value' acquisition processes." As described below, best-commercial practices and best-value procedures require mode neutrality.

ii. On March 18, 2008, the DoD issued DoD Instruction 4500.57, which "[e]stablishes amplifying policy and provides procedures for implementing the DoD transportation and traffic management policies." DoD Instruction 4500.57 explicitly states that "[t]o the maximum extent practicable, FAR and non-FAR procurements will be performance-based, mode-neutral, and time-definite; use best value acquisition processes and full and open competition."

h. Industry Practice. Best-commercial practices in the transportation industry require freight forwarders to be mode neutral in order to achieve the best value for the customer. Some relevant examples include:

i. When a shipper uses Federal Express, as set out in the Federal Express Airbill, Federal Express reserves the right to send the shipment totally by truck, stating in relevant part, "[w]e will determine the routing of all shipments, including the mode of transportation used, and may use air transportation, ground transportation or any combination thereof in providing our services. We reserve the right to divert any shipment (including use of other carriers) in order to facilitate its delivery."

ii. Retired Air Force General Walter Kross and retired Army Lieutenant General Kenneth R. Wykle, the former Commander and Deputy Commander, respectively, of the United States Transportation Command ("TRANSCOM"), a unified Command comprised of the SDDC, the Military Sealift Command ("MSC"), and AMC, and now the Chairman and President and Chief Operating officer of the National Defense Transportation Association ("NDTA"), have stated that it is the custom and practice in the industry for air freight forwarders to ship by the mode or modes that best meet the time-definite requirements of the service requested and that air freight forwarders have been and still are permitted to ship Government freight entirely by surface transportation.

iii. The Air Forwarders Association ("AFA"), an industry group of air freight forwarders, stated in a letter to TRANSCOM that the air freight forwarding industry has interpreted the SDDC agreement and the terms of AFTRP No. 5 to allow air freight forwarders to use the most cost-efficient means of transportation necessary to meet the requirements for a time-definite delivery. The AFA also states that the commercial best interests of both the air freight forwarding industry and the DoD require that air freight forwarders continue to be allowed to operate in a mode-neutral way.

iv. The American Trucking Association ("ATA"), a federation of motor carriers, has also stated in a letter to TRANSCOM that the most reasonable reading of AFTRP No. 5 is that it only applies to direct air carriers and does not apply to air freight forwarders. The ATA letter states that, under industry standard, it is the air freight forwarder's job to use its professional judgment in furnishing transportation in a manner that meets the time and other service requirements of the DoD shipper, and that commercial best practices require mode neutrality.

i. Other Similar Government Contracts. In numerous other DoD contracts for the shipment of cargo, DoD has followed a mode-neutral approach and does not dictate the mode of shipment for DoD freight shipped for time-definite delivery. Some relevant examples include:

i. World Wide Express ("WWX") Contract. Commercial express time-definite, door-to-door delivery contract for DoD freight for shipments up to 150 lbs. The WWX Contract is explicitly mode neutral.

ii. International Heavyweight Express Contract ("IHX") Contract. Similar to WWX Contract for packages weighing between 151-300 lbs. The IHX Contract is explicitly mode neutral.

iii. International Commercial Heavyweight Air Tenders. Tender contracts for international shipments in excess of 300 lbs. These tender contracts are explicitly mode neutral.

iv. GSA Schedule Contracts for Continental United States ("CONUS") Express Service. CONUS express delivery contracts for packages up to 150 lbs per piece. The GSA Schedule Contracts are explicitly mode neutral.

v. Defense Transportation Coordination Initiative ("DTCI"). The DoD proposed initiative to replace the current domestic military freight shipments procured using the tender system (the exact same freight at issue in this case). The proposed DTCI contract is explicitly mode neutral.

j. Representations of Government Officials. NAC, and its officers and representatives, have repeatedly been told by Government officials that air freight forwarders like NAC are not required to use any specific mode of transportation when shipping DoD freight under its tender offers and the subsequently issued CBLs. Some relevant examples include:

i. In November of 1998, an AMC representative informed the air transportation industry that the Air Leg Requirement language in AFTRP No. 5 was "intended for use by those arranging shipments (TO [Transportation Officer] or govt rep), not air carrier/freight forwarders."

ii. In a letter dated August 25, 2004, William Merrigan, SDDC's Supervisory General Attorney, the senior SDDC lawyer in charge of issues such as these, confirmed, in writing, that NAC has the right under the SDDC Agreement and otherwise to ship DoD freight entirely by truck. In fact Mr. Merrigan stated conclusively,

> To the extent any terms found in AFTRP No. 5 may create ambiguities, I can state that

> the common and accepted practice regarding application of any arguably ambiguous terms for at least the past several years has been to allow air freight forwarders to ship DOD commodities by air, truck, or combination of modes. . . .
>
> In the absence of a specific commodity or type of movement that requires air transport as a component to safe and effective transportation, the insistence that an air freight forwarder always use air transport is impracticable and potentially contrary to DOD's stated intent to acquire 'best value' in transportation services. . . . Further, by allowing the freight forwarder to choose among available motor and air carriers, forwarders have more opportunities to offer DOD lower rates (viz., best value based on costs) than if restricted to air carriage options.

iii. In numerous statements to NAC's officers as well as NAC's counsel, Mr. Earl Boyanton, the Assistant Deputy Under Secretary of Defense (Transportation Policy), the senior DoD official for DoD Transportation Policy, has stated that, as far as he and the DoD are concerned, air freight forwarders may use any mode of transportation they wish as long as the freight gets to its destination on time. Mr. Boyanton went so far as to say on numerous occasions that, as far as the DoD was concerned, NAC could ship the freight on a camel, as long as it got there on time.

iv. On July 30, 2004, SDDC issued a Question and Answer publication, which, in response to the question of whether the government decides what freight must move by air or ground, states, "[i]t is the contractor's choice as to what mode to use in order to meet transit times."

23. Despite the overwhelming evidence that air freight forwarders are supposed to be mode neutral when moving domestic DoD freight, AMC issued an order to NAC, an air freight forwarder, that it must use an airplane for one leg of every shipment moved for the DoD. In a letter dated March 24, 2005, Mr. Dale Huegen of AMC informed NAC that all of its tender offers would be cancelled by the Government and it would no longer be allowed to ship freight for the DoD if it did not agree to use air transportation for one leg of each and every shipment (the "Air Leg Requirement") ("Huegen Letter," attached as Exhibit B).

24. On April 4, 2005, NAC informed AMC that it disagreed that the terms of AFTRP No. 5 imposed an Air Leg Requirement on air freight forwarders. However, based on AMC's threat to cancel all of NAC's domestic tenders, NAC would comply with AMC's order for future shipments pending resolution of the dispute.

25. On information and belief, NAC is the only air freight forwarder that has been forced to comply with the Air Leg Requirement. In other words, none of NAC's competitors are forced to use an airplane for every domestic military shipment and are free to use the most cost-effective mode of delivery in accordance with the contract, regulations, policy, and industry practice.

26. In March of 2005, NAC had eleven tenders on file in the GFM system. On May 20, 2008, NAC had five tenders on file in GFM. For each of those tenders, the Government placed NAC at a competitive disadvantage by forcing NAC, and NAC alone, to comply with the Air Leg Requirement for all shipments shipped under those tenders.

27. For each tender, NAC has only two choices, both of which are unacceptable. It must either raise the tender rate it offers to the Government to avoid a loss due to the Air Leg Requirement, or, in order to compete with other air freight forwarders not subject to the Air Leg Requirement, leave its tender rates at the lower blended rates and lose money on those shipments.

28. The Defense Transportation Regulations ("DTR") that govern the procurement of shipping services for domestic military freight prohibit favoring one air freight forwarder over another absent some operational reason to do so.

29. Specifically, DTR, Part II, Chapter 201 § L (4) states that "[t]raffic managers and shipping activities will seek ***full and open competition to the maximum extent possible from qualified carriers***." (emphasis added).

30. DTR, Part II, Chapter 201 § S (3) states that "[t]he acquisition process will involve the customer and transportation service providers early in and throughout the transportation acquisition process. The involvement of transportation providers will be accomplished in a fair and equitable manner; ***care will be taken not to favor some firms in an industry over others***." (emphasis added).

31. The Due Process Clause of the Fifth Amendment also prohibits the Government from discriminating against one air freight forwarder in favor of other air freight forwarders absent some rational basis to do so.

32. Due to competition from air freight forwarders not subject to the Air Leg Requirement, NAC could not raise its tender rates for certain tenders and expect to keep its customers. Between April 4, 2005 and the May 20, 2008, NAC moved approximately 10,100 shipments under tenders where the blended rates offered to the Government were based on the ability to move the freight in a mode-neutral manner. Because the Government imposed the Air Leg Requirement on NAC, NAC was forced to incur higher costs on those shipments, but only received payment based on the blended tender rates. As a result NAC lost a total of approximately $1,800,000 of profits that it would have otherwise made on those shipments

33. Because NAC has been forced to raise its tender rates for some of its tenders as a result of the cost of complying with the Air Leg Requirement, many DoD shippers, who by regulation must take price into account, have chosen NAC's competitor's lower-priced tenders over NAC's tenders. As a result, NAC lost the opportunity to fairly compete for DoD domestic freight shipment from April 2005 until May 20, 2008.

## CAUSES OF ACTION

## COUNT I

**(Breaches of Contracts – 10,109 Shipments from April, 2005 – May, 2008)**

34. Paragraphs 1-33 are realleged.

35. NAC's agreement with SDDC and its contracts with the government entitle NAC to ship freight in a mode-neutral manner, i.e., by land, by air, or by any combination of land and air.

36. By forcing NAC to fly at least one leg of each shipment, the Government materially changed the terms of its contracts with NAC and violated the SDDC Agreement.

37. As a result, the Government, as described herein, breached its contracts with NAC.

38. As a result of the Government's breaches of contract, NAC lost profits that it would have otherwise received.

39. By reason of the foregoing, NAC has sustained monetary damages in an amount to be proven at trial, which is expected to be no less than $1,800,000.

**COUNT II**

**(Violation of Defense Transportation Regulations)**

40. Paragraphs 1-39 are realleged.

41. The DTRs require the Government to "seek full and open competition to the maximum extent possible from qualified carriers" and "not to favor some firms in an industry over others."

42. By issuing the Huegen letter only to NAC, and no other air freight forwarder, AMC violated the DTRs by applying a material condition to all of NAC's domestic military

shipment contracts that was not applied to other air freight forwarders competing for the same shipments.

43. There was no rational basis for applying this condition to NAC's contracts and not applying this condition to the contracts of any other air freight forwarder. Accordingly, the Government's decision to impose the Air Leg Requirement on NAC was in violation of the DTRs, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## COUNT III

**(Discriminatory Treatment – Loss of Business)**

44. Paragraphs 1-43 are realleged.

45. The Government solicits tender offers for moving domestic military freight through the GFM system.

46. By filing its tenders in the GFM system, NAC bids for DoD contracts to ship domestic military freight. Other air freight forwarders with tenders on file that would apply to the same prospective shipment are bidding for the same contracts as NAC.

47. The Due Process Clause and the Defense Transportation Regulations prohibit the Government from favoring one air freight forwarder over another.

48. The Huegen Letter directed NAC, and NAC alone, to comply with the Air Leg Requirement. Accordingly, NAC, and NAC alone, was placed at a competitive disadvantage and forced to either raise its tender rates or incur a loss on its shipments.

49. The decision to order NAC, and NAC alone, to fly one leg of each shipment, as articulated in the Huegen letter, was arbitrary, capricious, an abuse of discretion, and otherwise

not in accordance with law.

50. As a result of the Huegen letter, on October 15, 2006, NAC was forced to raise its tender offer rates for some of its tenders due to extensive losses on those routes. Because NAC's raised tender rates were higher than its competitors, transportation officers selected NAC's competitors for those shipments instead of NAC. NAC, therefore, did not receive many domestic military shipments that it would have otherwise received from October 15, 2006 until May 20, 2008. As a result, NAC lost business and suffered damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff NAC, by its undersigned counsel respectfully requests and demands that this Court enter judgment against the Government and in favor of Plaintiff NAC:

a. Declaring that the terms of the contracts formed between NAC and the Government for the movement of domestic military freight allow NAC to choose the most efficient and cost-effective mode of transportation in order to ensure the freight is delivered on time at the lowest cost to the Government;

b. Declaring that the Government breached the contracts between NAC and the Government for approximately 10,109 shipments from April 4, 2005 until May 20, 2008 by forcing NAC to fly one leg of each shipment;

c. Declaring that the Government violated the Due Process Clause and the Defense Transportation Regulations by erroneously applying the Air Leg Requirement to NAC and not to any other air freight forwarder who ships domestic military freight for DoD;

d. Ordering AMC to rescind its order imposing the Air Leg Requirement on NAC; and

e. Ordering the Government to pay NAC:

1. its actual damages in an amount to be proven at trial,

2. an award of attorneys fees and costs, and

3. such other and further relief as the Court may deem appropriate.

Respectfully submitted,

*Attorney for Plaintiff*

By: ______________________

F. Whitten Peters
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
Fax (202) 434-5029

Dated: May 30, 2008

Of Counsel:

Terrence O'Donnell
Daniel P. Shanahan
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
Fax (202) 434-5029

# EXHIBIT A

Appendix G to Part 619

# AGREEMENT BETWEEN THE MILITARY TRAFFIC MANAGEMENT COMMAND AND AIR FREIGHT FORWARDERS GOVERNING THE TRANSPORTATION OF GENERAL COMMODITIES FOR AND ON BEHALF OF THE U.S. DEPARTMENT OF DEFENSE

1. The undersigned, who is duly authorized and empowered to act on behalf of National Air Cargo, Inc., hereinafter referred to as the Forwarder, as a prerequisite for consideration for participation in the transport of general commodities as an exempt Air Freight Forwarder, for the U.S. Department of Defense (DOD), agree to comply with all requirements, terms and conditions as set forth in this Agreement. Noncompliance with any provision of this Agreement will be sufficient grounds for immediate revocation of the forwarder's privilege to participate in the movement of DOD freight. For the purpose of this Agreement, an Air Freight Forwarder is defined as a person or company who acts as a common carrier. That is, a carrier who holds itself out to the general public to provide transportation of property for compensation, assembles and consolidates less-than-truckload freight, as defined in the Instruction for Preparation of Department of Defense Standard Tender of Freight Services, MT Form 364-4 (and revisions thereto). Part II, and uses for the whole or any part of the line-haul transportation the services of regulated motor or air carriers, break bulk and delivers the less-than-truckload freight holding out in its own name and under its own responsibility a through transportation service from point of receipt to destination.

2. Approval and Revocation.

a. Forwarder understands that its initial approval and retention of approval is contingent upon establishing and maintaining, to MTMC's satisfaction, sufficient resources to support its proposed scope of operations and services. Sufficient resources include personnel, facilities, carriers with adequate equipment, and finances to handle the traffic anticipated by DOD/MTMC under the forwarder's proposed scope of operations in accordance with the service requirements of the shipper.

b. The forwarder understands that MTMC may revoke approval at any time upon discovery of grounds for ineligibility or disqualification.

c. In addition to the initial evaluation, the forwarder agrees that it will cooperate with MTMC follow-up evaluations at any time subsequent to signing this Agreement to confirm continued eligibility.

d. Forwarder agrees and certifies that neither the owners, company, corporate officials, nor any affiliation or subsidiary thereof are currently debarred or suspended, disqualified by a MTMC Carrier Review Board (CRB), or placed in non-use by MTMC from doing business with DOD.

3. Lawful Performance.

a. Forwarder agrees to comply with all applicable federal, state, municipal and other local laws and regulations. No fines, charges, or assessments for overloaded vehicles or other violations of applicable laws and regulations will be passed to, or be paid by any agency of the Federal Government.

b. The Forwarder agrees to keep current and on file a list of all carriers to be used in the transport of DOD freight shipments. This list will contain, as a minimum, the company's name, president/vice president's name(s), operating authority number, corporate office address, telephone number and a designated 24-hour on call point of contact in the event of an accident or emergency situation. MTMC can direct the Forwarder not to use specific carriers in the movement of DOD freight shipments.

c. Forwarder further agrees and certifies that it will only use carriers that are approved through the Carrier Qualification Program (CQP) to transport DOD freight, and will not use any carrier that has been disbarred, suspended by the Government or which has been placed in nonuse or disqualified by MTMC from doing business with the DOD for the movement of any DOD freight shipments.

4. Operations. Forwarder agrees and certifies that it is operating as a forwarder as defined herein. If incorporated, evidence of incorporation, bearing the official seal of the state in which filed. Articles of Incorporation, listing all the officers of the corporation is attached and certified to be true, correct and current.

5. Insurance.

a. The Forwarder agrees to maintain a minimum of $1 million public liability insurance and $250,000 cargo insurance for loss and damage of Government freight. A copy of the certificate of I insurance must be on file with MTMC, ATTN: MTOP-QQ, prior to any performance of service by the forwarder.
b. The insurance, carrier in the name of the Forwarder, will be in force at all times while this Agreement is in effect or until such time as the forwarder cancels all tenders. Forwarder agrees to ensure that the policies include a provision requiring the insurer to notify MTMC prior to any performance of service by the carrier. The certificate holder block of the form will indicate that MTMC, 5611 Columbia Pike, ATTN: MTOP-QQ, Falls Church, VA 22041-5050, will be notified in writing, 30 days in advance of any changes or cancellation. the deductible portion will be provided on the certificate.
c. The insurance underwriter must have a policyholder's rating in the Best's Insurance Guide, listed in the Fiscal Service Treasury Department Circular 570, Listing of Surety Companies. Self-insurance will not be accepted.
6. Performance Bond.
a. Forwarder agrees to provide MTMC with a Performance Bond. The bond secures performance and fulfillment of the forwarder's obligation. It will cover default, abandoned shipments, bankruptcy and reprocurement costs. The bond will not be utilized for operational problems such as late pickup or delivery, excessive transit times, refusals, no shows, improper or inadequate equipment or claims for lost or damaged cargo. The bond must be issued by a surety company listed in the Fiscal Service, Treasury Department Circular No. 570. The sum of the bond shall be no less than $100,000. The bond must be completed on the form provided by MTMC and will be continuous until canceled. MTMC will be notified, in writing, 30 days in advance of any change or cancellation. A letter of intent (LOI) by the surety company is required with the initial application. Upon MTMC approval, the Forwarder will submit the performance bond before the Tender of Service will be accepted.
7. Safety.
a. Forwarder agrees not to use any carrier that has an "*unsatisfactory*" safety rating with the Federal Highway Administration (FHA), Department of Transportation (DOT), and if it is an intrastate motor carrier, with the appropriate state agency.
b. Shipments will be delivered in direct service without delay to the destination shown on the Government Bills of Lading (GBL) unless consignor or consignee directs diversion of the shipment to a new or difference destination. Deliveries will be made during the shipper's normal business hours.
c. Forwarder agrees to not divulge any information to unauthorized persons concerning the nature and movement of any shipment tendered to it.
d. The Forwarder agrees to notify, within 24-hours, the consignor and consignee named by the Government Bill of Lading (GBL) or Commercial Bill of Lading (CBL) of cargo loss, damage, or unusual delay. Information reported will include origin/destination, GBL/CBL number, shipping paper information, time and place of occurrence, and other pertinent details. Upon request, the Forwarder agrees to ensure MTMC is furnished a copy of accident reports submitted to DOT on Form MCS 50-T (property).
e. Forwarder agrees to have in place a company-wide safety management program. Forwarder safety program will comply with applicable Federal, State and local statutes or requirements. Safety programs at the company-wide or terminal level may be subject to evaluation by DOD representatives. The Forwarder further agrees to permit unannounced safety inspections of its facilities, terminals, equipment, employees, and procedures by DOD civilian, military personnel, or DOD contract employees.
8. Reserved.
9. Equipment.
a. Forwarder agrees to ensure equipment is spotted for loading at the time and place requested. Civil Reserve Air Fleet (CRAF) carriers will be utilized to the maximum extent possible for the movement of DOD freight. The Government reserves the right to reject the utilization of any equipment placed for loading by the Forwarder if it does not, upon inspection, meet the specifications and requirements for the particular shipment involved (sizes, cube, cleanliness, mechanical condition, etc.).
10. Shipment.
a. Further, the Forwarder agrees to not divulge any information to unauthorized persons concerning the nature and movement of any DOD shipment.
11. Documentation.
a. Forwarder agrees to accept GBLs on which freight charges will be paid by the Government, and will be bound by the terms and conditions states thereon.

b. Forwarder agrees to comply with the provisions of documentation prelodging in effect at military terminals in which cargo is consigned for further movement overseas. (Prelodging is the submission of advance shipment documents that identify the shipments to the military terminals prior to arrival of the cargo at the terminal to permit preparation of the terminal documentation.) Instructions will be provided by the consignees to furnish certain data at least 24-hours in advance of cargo arrival at the terminal.

12. Loss and Damage.

a. The Forwarder agrees to be fully liable for delivery of all cargo in the same condition as received at origin, except loss or damage caused by an act of God, public enemy act, omission of shipper, inherent vice or detrimental changes due to nature of commodity, or natural shrinkage. Forwarder agrees to settle promptly claims for loss or damage. Forwarder also agrees to provide the status of any shipment tendered to them within 24-hours after an inquiry is made.

13. Standard Tender of Service.

a. The Forwarder agrees to comply with the preparation and filing instructions and applicable freight rules publications issued by MTMC. Forwarder understands that MTMC will reject tenders not in compliance with these instructions.

b. The Forwarder agrees to publish a street address where the company office is located in lieu of a post office box number. MTMC must be advised of any change in address. Failure to do so is grounds to discontinue the use of the forwarder.

c. Forwarder understands that tenders inadvertently accepted and distributed for use and not in compliance with this Agreement, the provisions contained in the standard Tender of Freight Services, MT Form 364-R, or the applicable MTMC Freight Rules Publication and supplements thereof, will be subject to immediate removal or nonuse until corrections are made. The issuing forwarder will be advised when tenders are removed under these circumstances.

14. Rates.

a. Forwarder agrees to transport Government shipments at its lowest effective charge named in the tender applicable on the commodity transported, whether or not the rate tender is referenced on the GBL.

b. The Forwarder agrees to publish through rates guaranteed for at least 30 days. These rates must be filed with Air Mobility Command (AMC). The rates for movement of DOD cargo by air will be filed with AMC. The Forwarder must publish all rates, changes, and accessorial services on a Department of Defense Standard Tender of Freight Services, MT Form 364-R and must comply with the tender preparation instructions. (Only services annotated with a charge in the tender will be paid by the shipper.)

c. The Forwarder agrees to promptly refund all uncontested overcharges to the Government and authorizes the Government to deduct the amount of overcharges from any amount subsequently found to be due the Forwarder.

d. The Government reserves the right to pursue administrative claims directly with forwarders under the Interstate Commerce Act or other authorities.

15. Carrier Performance.

a. The Forwarder agrees that its performance, and standards of service will conform with its obligations under Federal, State and local law and regulations as well as the guidelines found in the Defense Transportation Regulation (DTR) and this Agreement. The Forwarder fully understands its obligation to remain current in its knowledge of service standards. The Forwarder accepts the Government's right to revoke ineligible, non-use, or disqualify the carrier for unsatisfactory service for any operating deficiency, noncompliance with terms of this Agreement or terms of any negotiated agreements, tariffs, tenders, bills of lading or similar arrangements determining the relationship of the parties, or for the publication or assessment of unreasonable rates, charges, rules, descriptions, classifications, practices, or other unreasonable provisions of tariffs and tenders. Rules governing the Carrier Performance Program are found in MTMC Regulation 15-1, and Army Regulation 55-355, DTMR. If a forwarder is removed or disqualified for 6 months or more, it will have to requalify.

b. Failure or nonperformance by the Forwarder with any of the terms or conditions of service will constitute a breach of this Agreement. The Government reserves the right to disqualify the Forwarder for unsatisfactory service until such time as the Forwarder establishes, to the satisfaction of DOD, that the operating or other deficienc(ies) have been corrected.

16. General Provisions. That the Forwarder must have a valid Standard Carrier Alpha Code (SCAC) and use it on all DOD billing documents to identify the forwarder. When a company holding the appropriate authority has operating divisions each with its own unique SCAC, each such division is required to execute a separate agreement with MTMC governing the transportation of protected commodities.

17. Terms of the Agreement.
a. The terms of this Agreement will be applicable to each shipment.
b. This Agreement shall be effective the date of acknowledgment by the Military Traffic Management Command, until terminated upon receipt of written notice by either party.
c. Nothing in this Agreement will be construed as a guarantee, by the Government, of any volume of traffic.
d. The Forwarder agrees to immediately notify MTMC of any changes in ownership, in affiliations, executive officers, and/or board members and forwarder name. Forwarder understands that failure to notify MTMC shall be grounds for immediate revocation of the Forwarder's approval and their participation in the movement of DOD freight.
18. Additional Specialized Requirements. The terms of this Agreement will not prevent different or additional requirements with respect to negotiated agreements or added requirements for other types of service and/or commodities.
19. Inquiries. Inquiries may be referred to Commander, Military Traffic Management Command, Attention: MTOP-QQ, 5611 Columbia Pike, Falls Church, VA 22041-5050.
20. Forwarder Acknowledgment and Acceptance.
a. The undersigned forwarder official, by affixing signature hereto, states that he has read and understands the general and specific terms and conditions of service outlined and agrees to provide service in accordance with such terms or conditions. Any information found to be falsely represented in the Qualification Form, the attachments or during the qualification procedures, to include additional requirements of this Agreement, shall be grounds for automatic revocation of this Agreement and immediate non-use of the Forwarder, the affiliated companies, division and entities.

FORWARDER'S ACKNOWLEDGE/ACCEPTANCE:

I, National Air Cargo, Inc. __________, (NAME OF FORWARDER, TYPED OR LEGIBLY PRINTED), verify under penalty of perjury under the laws of the United States of America, that the information contained in the forwarder qualification application packet and this Agreement is true, correct and complete. If representing a company or organization, I certify that I am qualified and authorized to offer this information. I know that willful misstatements or omissions of material facts constitute Federal criminal violations punishable under 18 U.S.C. 1001 by up to 5 years imprisonment and fines up to $10,000 for each offense, or punishable as perjury under 18 U.S.C. 1621 by fines up to $2,000 or imprisonment up to 5 years for each offense. Further, I understand the requirements of this Agreement and on behalf of National Air Cargo, Inc. __________, (NAME OF FORWARDER, TYPED OR LEGIBLY PRINTED), comply with the terms and conditions contained therein.

[signature] / Vice President
(Signature of Carrier Official and Title)

____________________
(Signature of Agent Official and Title)

Date: 3/17/97
Address: National Air Cargo, Inc.
350 Essjay Rd., Buffalo, NY 14221
Telephone Number: 800-635-0022
24-Hr Emergency Number: 800-635-0022
Military Traffic Management Command Acknowledgment/Acceptance Signature and Title:

____________________

Date Approved: __________

# EXHIBIT B

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR MOBILITY COMMAND

25 March 2005

MEMORANDUM FOR NATIONAL AIR CARGO

FROM: HQ AMC/A34Y
402 Scott Drive, Unit 3A1
Scott AFB, IL 62225

SUBJECT: Modality Requirements of AMC Freight Traffic Rules Publication No. 5

1. Our office has been advised that National Air Cargo is currently under investigation for possible alleged irregularities/offenses that include routinely and intentionally performing tender shipments for the Department of Defense pursuant to AMC Freight Traffic Rule Publication No. 5 (AFTRP No.5) that are not in compliance with that rule's requirement that shipments must move, all or in part, via air transportation unless extreme conditions (e.g., severe weather, strikes, etc.) warrant diversion to motor service. We have also been informed National Air Cargo may be facing possible Department of Justice (DOJ) action for these offenses.

2. Every tender offered and approved under AFTRP No. 5 is subject to the above condition. Each shipment must be moved, at least in part, by air unless it can be shown that unusual circumstances warrant application of the exception. No blanket exception is recognized nor will one be considered for any category of shipment or any route.

3. Prior to release of AFTRP No. 5, a carrier meeting was held to discuss changes being made to the Rules publication. National Air Cargo representatives were in attendance at the meeting held November 10th, 1998. The requirement that a portion of the move be performed by air, added to Item 5, Paragraph 1 of the rules, was discussed at the meeting and no comments were received concerning the intent of this requirement. On March 24, 1999 you personally submitted written comments regarding AFTRP No. 5 to this office. The comments addressed two items you believed needed to be changed. Neither comment concerned the aforementioned requirement.

4. Communication made more recently on behalf of National Air Cargo questioning the applicability or interpretation of the requirement for air transport suggests the possibility that National Air Cargo may intend to transport future shipments routinely by surface transport in contravention of the air transport requirement. Accordingly, we intend to cancel National Air Cargo's domestic air tenders unless we receive adequate written assurances not later than April 4, 2005 that National Air Cargo will comply with the requirement as stated above.

5. This email is intended only to address the conduct of future shipments, if any, transported by National Air Cargo under AFTRP No. 5. It is not intended to affect or excuse any past action or to preclude government action or remedy of any nature, for any cause, based upon past shipments or any future failure to comply with the requirements of AFTRP No. 5.

Dale J. Huegen

DALE J. HUEGEN, GS-15, USAF
Chief, Contract Airlift Division
Directorate of Operations